**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FIREFIGHTER BRAD SPEAKMAN, RET.; ) | |
| SENIOR FIREFIGHTER TERRANCE TATE, ) | |
| RET.; LIEUTENANT JOHN CAWTHRAY; ) | |
| KELLI ANN STAR-LEACH as Administratrix of ) | |
| the Estate of LIEUTENANT CHRISTOPHER M. ) | |
| LEACH and as guardian ad litem of A.L. and M.L.; ) | |
| BRENDAN LEACH; LAURA FICKES, individually ) | |
| and as Executrix of the Estate of SENIOR ) | |
| FIREFIGHTER JERRY W. FICKES, JR.; BENJAMIN ) | |
| FICKES; JOSHUA FICKES; SIMONE CUMMINGS ) | |
| as Administratrix of the estate of SENIOR ) C.A. No. 18-1252-MN-MPT | |
| FIREFIGHTER ARDYTHE D. HOPE; ARYELLE ) | |
| HOPE; ALEXIS LEE; and ARDAVIA LEE ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| DENNIS P. WILLIAMS, individually; JAMES M. ) | |
| BAKER, individually; ANTHONY S. GOODE, ) | |
| individually, WILLIAM PATRICK, JR., ) | |
| individually; and THE CITY OF WILMINGTON, a ) | |
| municipal corporation ) | |
| ) | |
| Defendants. ) | |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

This matter concerns the death of three Wilmington Fire Department ("WFD")

firefighters and substantial injury to three other firefighters as a result of a house fire

that occurred on September 24, 2016 in the City of Wilmington, DE.[1]  Plaintiffs allege

the injuries sustained were proximately caused by the policies and actions of

Defendants regarding "rolling bypass," which Plaintiffs contend violate their substantive

_____
[1] D.I. 1 at 1.

due rights guaranteed by the Fourteenth Amendment of the United States Constitution.[2]

Presently before the court are five separate motions to dismiss for failure to state a claim filed by Defendants James M. Baker (Mayor Baker), Dennis P. Williams (Mayor Williams), Anthony S. Goode (Chief Goode), William Patrick, Jr. (Chief Patrick), and the City of Wilmington (the "City").[3]  Defendants argue that the complaint fails to state a violation of the 14th Amendment, which includes counts for 1) a State-created danger; 2) Defendants' conduct "shocks the conscience"; and 3) Defendants violated their policies, practices and customs.[4]  Defendants Mayor Baker, Chief Patrick, Mayor Williams, and Chief Goode also contend that they are not liable as a result of qualified immunity.[5]  Defendants Mayor Baker and Chief Patrick further maintain that Plaintiffs' action was untimely because the statute of limitations has expired.[6]  For reasons discussed herein, Defendants' motions to dismiss by Mayor Baker and Chief Patrick, are GRANTED.  Defendants' Motions to Dismiss for Mayor Williams and Chief Patrick and the City are GRANTED in part, and DENIED in part.

## II.    BACKGROUND

### A.    Factual Background

#### 1.    Mayor Baker, Chief Patrick

Mayor Baker began took office in January 2001 and served until January 2013.[7] Chief Ford was appointed Chief of Fire by Mayor Baker and served from January 2002

---

[2] *Id.*
[3] D.I. 34, 37, 39, 41, 43.
[4] D.I. 35 at 6-16.
[5] *Id.* at 16.
[6] *Id.* at 17.
[7] D.I. 1 at 15, 27.

to July 2007.[8]  During his term, Mayor Baker began exploring a new policy called rolling bypass, as a means of controlling overtime costs.[9] [10]  Mayor Baker decided to institute a rolling bypass policy where an engine truck (instead of a ladder truck) was the designated fire apparatus to be out of service.[11]

When Mayor Baker ordered implementation of rolling bypass, Chief Ford refused to institute it because he believed the policy was illegal.[12]  Chief Ford determined that "rolling bypass was unnecessarily dangerous and that implementation would result in the needless and avoidable deaths of both firefighters and civilians."[13]  He prevented Mayor Baker from implementing rolling bypass during the remainder of his service. Upon Chief Ford's retirement, Mayor Baker appointed a new Fire Chief.[14]

### 2. Implementation of Rolling Bypass

Mayor Baker appointed William Patrick to Chief of Fire in July 2007. Immediately upon this appointment, Mayor Baker began discussing implementation of rolling bypass, to which Chief Patrick agreed.[15]  Plaintiffs assert that despite various concerns, warnings, and objections expressed by Local Union 1590, the media, the

---

[8] *Id*. at 15.
[9] *Id*. at 15.
[10] "Rolling bypass" (also referred to as "brownouts," "rolling brownouts," and "conditional company closures") is a policy where a fire truck is taken out of service for the rest of the shift if a certain number of vacancies on that shift require overtime to be fully staffed.  Rather than paying off-duty firefighters to work an overtime shift, the department instead closed down a fire engine.
[11] *Id*. at 16.
[12] *Id*. at 17.
[13] *Id.*
[14] *Id*. at 18.
[15] D.I. 1 at 18.

public, and City Council, rolling bypass began on July 1, 2009.[16]  Although Mayor Baker and Chief Patrick met with Local 1590 officials quarterly during which the Local's representatives allegedly repeatedly warned of the significant increase in hazards and dangers caused by rolling bypass, the Baker Administration maintained its use.[17]

Opposition continued against rolling bypass.  In December 2010, Captain Richard Lamb publicly warned Mayor Baker and Chief Patrick, saying "we're rolling the dice."[18]  Also in December 2010, the New Castle County Fire Chief's Association warned the Baker Administration that its actions would "jeopardize the city."[19]  Plaintiffs further allege Mayor Baker and Chief Patrick were aware of the widespread media attention and widespread criticism of the rolling bypass policy.[20]

Plaintiffs assert that in response to the media attention, Mayor Baker and Chief Patrick repeatedly misled the public and the City Council with false information that responses times would not be compromised by rolling bypass, and that response times had actually decreased.[21]  Despite efforts to keep rolling bypass operating smoothly, overtime costs increased and City Council complained that it was "impossible to get a straight answer out of them."[22]

### 3.    Mayor Williams, Chief Goode

Mayor Williams took office in January 2013 and served until January 2017.[23]

---

[16] Id. at 18-19.
[17] *Id*. at 21.
[18] *Id*. at 22.
[19] *Id*.
[20] *Id*. at 22-23.
[21] *Id*. at 23.
[22] *Id*. at 25-26.  This comment was a reference to Mayor Baker and Chief Patrick.
[23] D.I. 38 at 4.

During his election campaign, his platform concentration on public safety which repeatedly attacked rolling bypass as "unsafe and unreasonably dangerous."[24]  Mayor Williams appointed Anthony S. Goode to Chief of Fire soon after taking office.[25]  Plaintiffs allege, however, that Mayor Williams and Chief Goode, through their policy decisions, allowed the WFD to become more dangerous and unsafe.[26]  In support of this contention, Plaintiffs note that Mayor Williams and Chief Goode refused to fill vacant firefighter positions by using overtime and rolling bypass to compensate for these vacancies.[27]  Plaintiffs further claim that Mayor Williams and Chief Goode's conduct deceived both the public and City Council on the rolling bypass policy's safety and effectiveness, including by renaming it "conditional company closures."[28]

However, despite the name change and some modifications to the policy, the substance of rolling bypass remained.[29]  Mayor Williams and Chief Goode repeatedly maintained there was no increased risk to firefighters or citizens by conditional company closures and response times would not increase.[30]  Plaintiffs allege that, in response, the Union issued renewed warnings to the public, the media, and City Council.[31]

Overtime costs increased significantly in excess of 4 ½ times the budgeted

---

[24] D.I. 1 at 26.  Because of the number of paragraphs and the interrelationship of the paragraphs, reference is made to the page numbers of the complaint.
[25] D.I. 40 at 4.
[26] D.I. 1 at 26.
[27] *Id*. at 28.
[28] *Id.* at 28.
[29] *Id*.
[30] *Id*.
[31] *Id*. at 29-30.

allocation.[32]  The increases expended on overtime prompted City Council to enact a new statute.[33]  This statute was designed to place limits on an administration's ability to ignore mandatory staffing levels, and to enable City Council, through its oversight of staffing and overtime, to ensure accountability in the WFD.[34]  The new statute required the Chief of Fire to submit quarterly staffing reports and to formally notify City Council if manpower levels fell below 95% of the budgeted number of firefighters.  It further required the initiation of a mandatory academy firefighter class if this occurred.[35]  Even after the statute was enacted, Plaintiffs claim that Chief Goode refused to comply by failing to submit the quarterly manpower reports and to notify City Council when staffing levels fell below the 95% threshold.[36]  Plaintiffs aver his conduct was intended to conceal the severe under-staffing from City Council.  Plaintiffs also contend that Chief Goode misrepresented that he was prevented, under the statute, from filling the vacancies "until the 95% threshold was reached."[37]

According to Plaintiffs, Chief Goode further complicated staffing issues by transferring 16 firefighters from fire suppression positions to desk jobs between 2015 and 2016.[38]  These administrative employees worked regular daytime hours, did not fight fires, and provided no fire suppressing support to the firehouses.[39]  Chief Goode

---

[32] *Id*. at 31.
[33] *Id*. at 32.
[34] *Id*.
[35] *Id*. at 33.
[36] *Id*. at 33-34.
[37] *Id*. at 34.  Chief Goode allegedly misrepresented that his hands were tied.
[38] *Id*. at 34-35.
[39] *Id*. at 35.

doubled the number of desk jobs during his tenure.[40]  Plaintiffs allege that the effect of

Chief Goode's policy resulted in each shift being down four firefighters, and possibly

more, before consideration of vacation, sick and union time, and other types of

authorized leaves.[41]  Overtime continued to increase.  City Council questioned Chief

Goode's rationale, describing his policy as "nonsense."[42]

Plaintiffs contend that Chief Goode demonstrated his level of improper intent,

malice, and bad faith during a meeting with Union officials and firefighters.  When Union

officials argued that his policies would increase the deaths of firefighters and civilians,

his purported reply was, "I don't care if you die in a fire."[43]  Plaintiffs claim Chief Goode

also stated that he was unconcerned about any complaints or lawsuits because his

money was not in jeopardy from any resulting settlements.[44] [45]

According to Plaintiffs, rolling bypass was a known failure.[46]  The City Controller

for Philadelphia delivered a report in February 2016 which detailed the effects and

realities of rolling brownouts (also known as rolling bypass) in the Philadelphia Fire

---

[40] *Id.* at 35-36.
[41] *Id*. at 36.
[42] *Id*. at 37.
[43] *Id*.
[44] *Id.* at 39.
[45] Chief Goode allegedly made other offensive statements, such as, "I don't give a f--k about you and your families" since he was "gonna get mine," that he hated his subordinates, and that he only answered to and took direction from Mayor Williams. Other similarly offensive comments which Plaintiffs attribute to Chief Goode were purportedly made during his tenure.  D.I. 1 at 39-40.
[46] Although plaintiffs assert in their complaint that rolling bypass was a known failure "across the country" which was again parroted in their answering brief, their only specific reference is to the experience in the City of Philadelphia.

Department ("PFD").[47]  This report exposed that the PFD's response times increased

and fell below national averages, which jeopardized public safety and more than

doubled overtime costs from $15.7 million to $34.2 million.[48]  The report further

revealed a rise in the loss of firefighter and civilian lives, more severe injuries, and an

increase in response times.[49]  As a result, the PFD ended the use of rolling brownouts.[50]

### 4.    The Canby Park Fire

Plaintiffs assert that the tragic incident on September 24, 2016 resulted from the

continued use of rolling bypass combined with persistent under-staffing.[51]  At

approximately 2:56 a.m., Ladder 2, Engine 1, Engine 5, Squad 4, Battalion 2, and

Battalion 1 were dispatched to 1927 Lakeview Road, in the Canby Park area, upon a

report of a residential fire in a brick row home with persons trapped inside.[52]  The fire

was a result of arson, initiated by Beatriz Y. Fana-Ruiz.[53]  Plaintiffs allege that the "first

due" engine was Engine 6, located nearby, but it was out of service because of under-

staffing and rolling bypass.[54]  The next closest station was twice the distance away.[55]

Ladder 2, commanded by Lt. Leach, arrived on scene.  Lt. Leach noted heavy fire in the

---

[47] *Id*. at 41-45.  Despite citing this report in their complaint and answering brief, both including specific pages numbers, this judge was unable to locate a copy of this report attached to either Plaintiffs' complaint or answering brief.

[48] *Id*. at 44-45.

[49] *Id*. at 44.

[50] *Id*. at 45.

[51] *Id*. at 49-61.

[52] *Id*. at 55.

[53] D.I. 44, Exhibits A and B.  WFD requested an investigation of the fire's origins. Beatriz Y. Fana-Ruiz was indicted for arson and multiple other counts, including first degree murder, for the fire on November 16, 2016.

[54] D.I. 1 at 55.

[55] *Id*. at 55-56.

rear of the home.  He requested Dispatch send an engine to the rear of the home.

Several minutes later Engine 1 and Engine 5 arrived and immediately began applying

water to the front of the home.[56]  Crews from Engine 1 and Engine 5, including Ffr.[57]

Speakman, Lt. Cawthray, Sr. Ffr. Hope, and Lt. Leach, entered the first floor and

searched for trapped civilians.[58]  As they began their search and rescue, the first floor

collapsed on the south side of the home, which caused Lt. Leach, Ffr. Speakman, and

Sr. Ffr. Hope to fall into the basement.[59]  After a Mayday transmission, firefighters on

the scene attempted to rescue their endangered companions.[60]

Thereafter, Squad 4 arrived.  Their usual function was to serve as the team

responsible for search and rescue of civilians.[61]  After Squad 4's arrival, it was divided

into two teams, with one directed to the front of the home, and the other to assess

whether the fire was spreading.[62]  As a result of the Mayday, other firefighters were

diverted to the rescue efforts.[63]

Ffr. Speakman was rescued from the front of the home.[64]  Firefighters were able

to transport Sr. Ffr. Hope to the ground ladder in the basement, but lost her in the

shifting smoke.[65]  Sr. Ffrs. Fickes and Tate located Lt. Leach, who advised that his back

was broken.  In their attempt to rescue him, Tate fell backward and Leach landed on

---

[56] *Id*. at 56.
[57] "Ffr." is the abbreviation for firefighter.
[58] D.I. 1 at 56.
[59] *Id*. at 57.
[60] *Id.*
[61] *Id.*
[62] *Id*. at 58.
[63] *Id.*
[64] *Id*. at 59.
[65] *Id.*

top of him.[66]  The remainder of the first floor then collapsed into the basement and onto Sr. Ffr. Fickes and Lt. Leach.[67]  Sr. Ffr. Tate was eventually pulled free.[68]  Firefighters crawled across the debris and found Sr. Ffr. Fickes face down.[69]  He was removed and transported to a trauma center, where he was pronounced dead from asphyxiation and thermal burns.[70]

Firefighters then entered the basement from the rear alley where they found Sr. Ffr. Hope on the floor without her protective gear on.[71]  She was conscious and talking when firefighters carried her from the basement.  She later succumbed to her injuries and died on December 1, 2016.[72]  The fire was finally extinguished around 5:50 a.m.[73] Lt. Leach's body was later found beneath the rubble.[74]

Within hours thereafter, Chief Goode emailed all battalion Chiefs suspending conditional company closures until further notice.[75]  However, conditional company closures were resumed before the end of November 2016.[76]

### 5. Plaintiffs' Damages

Plaintiffs sue for damages related to physical and emotional pain and suffering, mental anguish, emotional distress, loss of enjoyment of life, and other losses and

---

[66] *Id.*
[67] *Id.* at 60.
[68] *Id.*
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.* at 61.
[76] *Id.*

injuries.[77]  They allege physical injuries of death, fractures, burns, and asphyxiation.[78]

Their economic damages include burial costs, funeral expenses, loss of wages,

earnings and benefits (pension and retirement), and decreased earning capacity.[79]

Therefore, Plaintiffs' complaint seeks damages available under 10 *Del. C.* §§3701 and

3724, Delaware's survival and wrongful death statutes.[80]

Plaintiffs assert the following Counts:

**Count I** - 14th Amendment - Substantive Due Process - State Created Danger
**Count II** - 14th Amendment - Substantive Due Process - Shocks the Conscience
**Count III** - 14th Amendment - Substantive Due Process - Maintenance of
Policies, Practices, and Customs[81]

## B.    Procedural Background

The complaint was filed on August 16, 2018.[82]  On August 22, 2018, this case

was assigned to Judge Richard G Andrews.  Various motions for extension of time to

respond to the complaint were filed.[83]  An order was entered on September 4, 2018

making responses due on October 15, 2018.[84]

Thereafter, on September 5, 2018, this matter was reassigned to Judge Colm F.

Connolly.  Subsequently, this case was reassigned to Judge Maryellen Noreika on

September 19, 2018.  On October 11, 2018, stipulations were filed for a briefing order

by the City on its motion to dismiss, and for an extension of time to respond to the

---

[77] *Id*. at 67.
[78] *Id*.
[79] *Id*.
[80] *Id.*
[81] Id. at 73.
[82] D.I. 2.
[83] D.I. 12, 19, 21.
[84] D.I. 24.

complaint by Mayor Williams.[85]  Both were granted.[86]

Motions to dismiss for failure to state a claim, along with opening briefs, were filed by the remaining Defendants on October 15, 2018.[87]  A briefing schedule was entered on October 16, 2018.  On January 7, 2019, Plaintiffs filed their answering brief.[88]  All reply briefs were filed by February 4, 2019.[89]  Judge Noreika entered an Oral Order on February 11, 2019 addressing Plaintiffs' letter of subsequent authority pursuant to D. Del LR 7.1.2(b), which also allowed Defendants to respond by February 19, 2019.[90]  Plaintiffs filed a stipulation to amend the caption and complaint, which was granted on June 14, 2019.[91]  On June 21, 2019, Defendants' five motions to dismiss for failure to state a claim were assigned to this judge.

## III.   GOVERNING LAW

### A.   Rule 12(b)(6)

In analyzing a motion to dismiss under FED. R. CIV. P. 12(b)(6), a review of Rule 8(a)(2) is also necessary.  It requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  This standard "does not require 'detailed factual allegations,' but . . . demands more than an

---

[85] D.I. 31, 32.

[86] D.I. 33.

[87] D.I. 34, 35, 37 through 44.

[88] D.I. 46.

[89] D.I. 47 through 51.

[90] D.I. 53, 54.  These letters addressed the recent decision of *Estate of Roman v. City of Newark*, 914 F.3d 789 (3rd Cir. 2019) which analyzed the issue of municipal liability in a § 1983 case.  The decision was rendered on January 29, 2019, after plaintiffs' answering brief was filed and five (5) days before the reply briefs were due.

[91] D.I. 55, 56.  The parties agreed that entry of this stipulation and order resulted in minor changes and has no effect on the outstanding motions.

unadorned, the-defendant-unlawfully-harmed-me accusation."[92]  Thus, to survive a

motion to dismiss under Rule 12(b)(6), a complaint "must contain sufficient factual

matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[93]  The

purpose of a Rule 12(b)(6) motion to dismiss is to test the sufficiency of the complaint,

not to resolve disputed facts or decide the merits of the case.[94]  Evaluating a Rule 12

(b)(6) motion requires the court to accept as true all material allegations of the

complaint.[95]  "The issue is not whether a plaintiff will ultimately prevail, but whether the

claimant is entitled to offer evidence to support the claims."[96]  A motion to dismiss may

be granted only if, after, "accepting all well-pleaded allegations in the complaint as true,

and viewing them in the light most favorable to the plaintiff, plaintiff is not entitled to

relief."[97]

   To survive a motion to dismiss under Rule 12(b)(6), the factual allegations must

be sufficient to "raise a right to relief above the speculative level, on the assumption that

all the allegations in the complaint are true (even if doubtful in fact)."[98]  A plaintiff is

obliged "to provide the 'grounds' of his entitle[ment] to relief'" beyond "labels and

conclusions."[99]  Heightened fact pleading is not required:  rather "enough facts to state

---

[92] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).
   [93] *Id.* (quoting *Twombly*, 550 U.S. at 570); *see* FED. R. CIV. P. 12(b)(6).
   [94] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993).
   [95] *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004).
   [96] *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks and citations omitted).
   [97] *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks and citations omitted).
   [98] *Twombly*, 550 U.S. at 555; *see also Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007).
   [99] *Twombly*, 550 U.S. at 555.

a claim to relief that is plausible on its face" must be alleged.[100]  Rejected are

unsupported allegations, "bald assertions," or "legal conclusions."[101]  Further, "the tenet

that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions."[102]  The analysis is a "context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."[103]

Well-pled facts, which only infer the "mere possibility of misconduct," do not show that

"the pleader is entitled to relief."[104]  "When there are well-pleaded factual allegations, a

court should assume their veracity and then determine whether they plausibly give rise

to an entitlement of relief."[105]

## IV.    DISCUSSION

### C.    Failure to State a Substantive Due Process Violation of the Fourteenth Amendment

The due process clause of the Fourteenth Amendment states, in pertinent

part, "[n]o State shall . . . deprive any person of life, liberty, or property, without due

process of law; nor deny to any person within its jurisdiction the equal protection of the

---

[100] *Id.* at 570.

[101] *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice."); *see also Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) ("[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.") (citations omitted); *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997) ("unsupported conclusions and unwarranted inferences" are insufficient); *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996) (allegations that are "self-evidently false" are not accepted).

[102] *Iqbal*, 556 U.S. at 678; *see also Twombly*, 550 U.S. at 555 (A court is "not bound to accept as true a legal conclusion couched as a factual allegation.").

[103] *Iqbal*, 556 U.S. at 679.

[104] *Id.*

[105] *Id.*

laws."[106]  The elements of a substantive due process claim are that:  (i) the defendant

acted under color of law; (ii) a protected property or liberty interest was at stake; (iii) the

defendant had a duty of care toward the plaintiff; and (iv) a deprivation within the

meaning of the due process clause occurred.[107]  To support a substantive due process

claim, the government's conduct must be "so egregious, so outrageous, that it may

fairly be said to shock the contemporary conscience."[108]  Section 1983 "is not itself a

source of substantive rights," but merely provides "a method for vindicating federal

rights elsewhere conferred."[109]  "The First Amendment, the Equal Protection and Due

Process Clauses of the Fourteenth Amendment, and other provisions of the Federal

Constitution afford protection to employees who serve the government as well as to

those who are served by them, and § 1983 provides a cause of action for all citizens

injured by an abridgement of them."[110]  "Substantive due process 'prevents the

government from engaging in conduct that shocks the conscience, . . . or interferes with

rights implicit in the concept of ordered liberty.'"[111]

### 1.    State-Created Danger

While "the Due Process Clause does not impose an affirmative obligation on the

State to protect its citizens, there is an exception to this general rule which "holds an

---

[106] U.S. Const. Amend. XIV
[107] *Fagan v. City of Vineland*, 22 F.3d 1296, 1310 (3d Cir.1994).
[108] *Kaucher v. County of Bucks*, 455 F.3d 418, 425 (3d Cir.2006).
[109] *Baker v. McCollan*, 443 U.S. 137, 144, n. 3 (1979).
[110] *Collins v. City of Harker Heights,* 503 U.S. 115, 120 (1992).
[111] *United States v. Salerno,* 481 U.S. 739, 746 (1987), *quoting Rochin v. California,* 342 U.S. 165, 172 (1952) and *Palko v. Connecticut*, 302 U.S. 319, 325-326 (1937).

officer liable if his conduct exposes an individual to a 'state-created danger.'"[112]  The

State-created danger theory requires a plaintiff to meet a four-part test:

"(1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the

state-actor 'acted with a degree of culpability that shocks the conscience'; (3) the state

and the plaintiff had such a relationship 'such that the plaintiff was a foreseeable victim

of defendant's acts', as opposed to a member of the public in general; and (4) the

official affirmatively used his authority 'in a way that created danger to the citizen or that

rendered the citizen more vulnerable to danger' than had he never acted."[113]  "[L]iability

for negligently inflicted harm is categorically beneath the threshold of Constitutional due

process."[114]  As noted, the second factor is only satisfied by conduct that "shocks the

conscience."[115]  Such conduct is often "the most difficult for a plaintiff to show, and thus

[the] ultimate conclusion frequently turns on [the court's] determination of whether given

conduct 'shocks the conscience.'"[116]

 "The exact degree of wrongfulness to reach the 'conscience-shocking' level

depends on the circumstances of a particular case."[117]  The Third Circuit recognizes

that in situations falling in the grey area between requiring 'true split second decisions'

and 'relaxed deliberation,' liability may be found if an official's conduct 'exhibits a level

---

[112] *Kedra v. Schroeter,* 876 F.3d 424, 436 ( 3d Cir. 2017).
[113] *Id., quoting Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir.2006).
[114] *Lewis,* 523 U.S. at 849.
[115] *Estate of Smith v. Marasco (Smith II)*, 430 F.3d 140, 149 (3d Cir. 2005), *quoting Estate of Smith v. Marasco (Smith I),* 318 F.3d 497, 507 (3d Cir. 2003).
[116] *Estate of Smith*, 430 F.3d at 149.
[117] *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir.1999).

of gross negligence or arbitrariness that shocks the conscience.'"[118]  Because Plaintiffs'

factual allegations do not satisfy all four elements, the court finds that they fail to state a

proper claim for a State-created danger.

### a.  Foreseeable and Fairly Direct

This element determines whether the harm ultimately caused was a foreseeable

and a fairly direct result of the State's actions.[119]  To satisfy the foreseeable

requirement, a plaintiff must allege on the part of the State-actors that rises to a level of

actual knowledge or an awareness of risk that is "sufficiently concrete to put the actors

on notice of the harm."[120]  "'To fulfill the 'fairly direct' requirement . . . , the plaintiff must

plausibly allege that state officials' actions 'precipitated or w[ere] the catalyst' for the

harm for which the plaintiff brings suit.'"[121]  This means the defendant's actions must

"'cause to happen or come to a crisis suddenly, unexpectedly, or too soon.'"[122]

Here, Plaintiffs meet the foreseeability requirement of the first prong because the

State-actors had actual knowledge and awareness of risk associated with rolling bypass

through media coverage, the report by the Philadelphia City Controller and other

sources.[123]  Plaintiffs fail to allege sufficient facts to meet the second requirement, that

---

[118] *Sanford v. Stiles,* 456 F.3d 298, 308 (3d Cir. 2006), quoting *Estate of Smith,* 318 F.3d at 509.

[119] *L.R. v. School District of Philadelphia*, 836 F.3d 235, 245 (3d Cir. 2016).

[120] *Phillips v. Cnty of Allegheny,* 515 F.3d 224, 238 (3d Cir. 2008).

[121] *Henry v. City of Erie*, 728 F.3d 275, 285 (3d Cir. 2013), quoting *Morse v. Lower Marion School District*, 132 F.3d 902, 904 (3d Cir. 1997).

[122] *Henry*, 728 F.3d at 285, *quoting Webster's Third New International Dictionary* 1784 (1993).  *Henry* further defined precipitate as "'to hasten the occurrence of; bring about prematurely, hastily or suddenly'", while defining catalyst as "'a person or thing that precipitated an event or change.'"  *Random House Dictionary of the English Language* 1512, 325 (2d ed. 1987).

[123] D.I. 1 at 41-45.

is, fairly direct.  The rolling bypass policy and/or inadequate staffing were not the direct

catalyst for the harm.  This fire was the result of arson committed by a third party.[124]

Therefore, the court finds that the facts alleged regarding the first element of a State-

created danger, specifically regarding fairly direct, are insufficient.

### b.    Deliberate Indifference

Deliberate indifference under the Fourteenth Amendment is a willingness to

ignore a foreseeable danger or risk.[125]  Courts apply this standard when there is not "a

'hyper-pressurized environment' requiring a snap judgement,"[126] but "where deliberation

is possible and officials have the time to make 'unhurried judgements.'"[127]  It is not

enough to show that the State increased the danger of harm from third persons.  A

plaintiff must also demonstrate that the State acted with the requisite degree of

culpability.[128]  To satisfy a showing of deliberate indifference requires a "conscious

disregard of a substantial risk of serious harm."[129]

In the instant matter, no snap judgement was required. There was no hyper-

pressurized environment.  As plaintiffs allege, rolling bypass was a policy that existed

and was implemented for over seven years.  Despite multiple discussions with Union

officials, media coverage and others where the risks of serious harm were repeatedly

addressed, this policy continued after the end of the Baker administration by the

---

[124] D.I. 44 at Exhibits A and B.

[125] *Kedra,* 876 F.3d at 443.

[126] *Vargas v. City of Philadelphia*, 783 F.3d 962, 973 (3d Cir. 2015), *quoting Sanford v. Stiles*, 456 F.3d 298, 308-09 (3d Cir.2006).

[127] *Vargas,* 738 F.3d. at 973, *quoting Lewis*, 523 U.S. at 853.

[128] *Morse v. Lower Merion School District*, 132 F.2d 902, 910 (3d Cir.1997).

[129] *Kedra,* 876 F.3d at 444, *quoting Vargas v. City of Philadelphia*, 783 F.3d 962, 973-74 (3d Cir. 2015).

18

Williams administration, albeit under another name and with some policy modifications. Accordingly, the court finds that Plaintiffs' contentions are sufficient to meet the element of deliberate indifference.

c.  **Special Relationship**

The State-created danger doctrine applies only where a "special relationship" exists, which means the "victims of state officials' conduct are persons who either expected government officials not to injure them, or justifiably relied on [these] officials to protect them from threats to their safety."[130]  While special relationships created or assumed by the State towards individuals may give rise to an affirmative duty to provide adequate protection under the Due Process Clause, this duty arises from the limitations imposed on the person's freedom to act on his own behalf, for example, because of imprisonment, institutionalization, or other similar restrain of personal liberty.[131]  In cases where "the State takes a person into its custody and holds him there against his will, the Constitution imposes a corresponding duty to assume some responsibility for his safety and general well-being."[132]  Where government officials in unhurried situations consciously disregard the risk of harm to persons relying on them for safety, even if they are unaware that their actions would lead to serious or lethal harm, these

---

[130] *Kedra,* 876 F.3d at 448.  *See, e.g. L.R.*, 836 F.3d at 239-40, 247; *Phillips*, 515 F.3d at 228-29, 242-43; *Kneipp*, 95 F.3d at 1201-05 *citing DeShaney*, 489 U.S. at 199-200).

[131] *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 200 (1989).

[132] *Id.  See also, Stoneking v. Bradford Area School District*, 882 F.2d 720, 723 (3d Cir.1989) noting the significance of the status of the perpetrator as a private actor v. a state official was emphasized in the *DeShaney* opinion.  *Id.* at 724.

persons or their estates may be entitled to sue for compensation.[133]

In the instant matter, Plaintiffs allege a special relationship which required Defendants to protect them from threats to their safety. There is, however, no requirement to provide municipal employees with minimal levels of safety and security.[134] A special relationship "impose[s] affirmative duties of care and protection on the state . . . only in certain limited circumstances, such as when the state takes a person into its custody and holds him there against his will."[135] In such circumstances, "the Constitution imposes upon [the state] a corresponding duty to assume some responsibility for his safety and general well-being."[136] In the instant matter, there was no confinement or restraint on any personal liberty. The court finds that Plaintiffs fail to allege sufficient facts demonstrating a special relationship to support State-created danger.

### d. Use of Authority to Create an Opportunity for Danger

Liability exists when government officials, who are entrusted with duties and responsibilities to a person or class of persons, act with a conscious disregard of a substantial risk of serious harm, and affirmatively use their authority in a way that creates a danger to or renders such an individual or individuals more vulnerable to danger than in the absence of any action.[137] "There must be a direct causal relationship

---

[133] *Kedra*, 876 F.3d at 444.
[134] *Collins v. City of Harker Heights*, 503 U.S.115, 125-26 (1992).
[135] *Kneipp v. Tedder*, 95 F.3d 1199, 1204- 05 (3d Cir. 1996), *quoting DeShaney*, 489 U.S. at 197, 199-201.
[136] *DeShaney*, 489 U.S. at 199-200.
[137] *Kauchner v. County of Bucks,* 455 F.3d 418, 432 (3d Cir. 2006).

between the affirmative act and the plaintiff's harm."[138]  The fourth element of State-created danger is satisfied when only where the state's action was the "'but for cause' of the danger faced by the plaintiff."[139]  Absent sufficient factual allegations and evidence that State action is the "'but for cause of the plaintiff's harm, the fourth element is not satisfied.'"[140]

Plaintiffs allege that government officials are responsible for the harm sustained because it resulted from the continued use of rolling bypass and the failure to properly staff the WFD.  As previously discussed, rolling bypass was not the direct cause nor the but for cause of the harm to Plaintiffs.  Therefore, the court finds Plaintiffs' allegations of harm fail to meet this element under the doctrine of State-created danger.

## 2.    Shocks the Conscience

Substantive due process requires a defendant's conduct to shock the conscience and be so brutal and offensive that "it did not comport with traditional ideas of fair play and decency. . . . ."[141]  The Supreme Court has consistently held that mere negligence is insufficient to trigger constitutional liability.[142]  The measure of what is conscience-shocking is not a "calibrated yard stick."[143]  Whether the conduct shocks the conscience varies depending on the facts.  What is shocking in one environment may

---

[138] *Id.*
[139] *Id.*
[140] *Id.*
[141] *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1997).
[142] *Id.*
[143] *See United Artists Theater Circuit v. Township of Warrington, PA.*, 316 F.3d 392, 399 (2003), *quoting Lewis*, 523 U.S. at 847.

not be so "patently egregious in another."[144]  Conduct deliberately intended to injure by any government interest that is unjustified is the "type of official action to rise to the conscience-shocking level."[145]

In *Sauers v. Borough of Nesquehonig,*[146] the Third Circuit noted three distinct categories of culpability which depended on "how much time" a defendant had to make a decision.[147]  Where actions are taken in a "'hyperpressurized environment'", culpability does not arise "'unless [defendant] has 'an intent to cause harm.'"[148] The next category are actions "taken within a time frame that allows a [defendant] to engage in "'unhurried deliberation.'"[149]  Only when allegations "'reveal a conscious disregard of a great risk of serious harm'" are they sufficient to shock the conscious.[150]  "Finally, actions undertaken with 'unhurried judgments,' with time for "'careful deliberation'" shock the conscious if they are "'done with deliberate indifference.'"[151]

As previously determined, Plaintiffs in the instant matter properly allege that Defendants' conduct demonstrated deliberate indifference.  Rolling bypass existed for years prior to Mayor Williams' election and Chief Goode's appointment.  Mayor Williams campaigned on promises to address the dangers of rolling bypass.  When elected, he and Chief Goode were aware of media coverage that rolling bypass was a failed or

---

[144] *United Artists Theater Circuit*, 316 F.3d at 399, *quoting Lewis*, 523 U.S. at 850.
[145] *Lewis*, 523 U.S. at 842.
[146] 905 F.3d 711, 717 (3d Cir. 2018), *referencing Haberle v. Troxell*, 855 F.3d 170, 177 (3d Cir. 2018).
[147] *Sauers*, 905 F.3d at 717.
[148] *Id., quoting Haberle*, 855 F.3d at 177.
[149] *Id.*
[150] *Id.*
[151] *Id.*

failing program. Mayor Williams and Chief Goode understood that, with firehouses closed, overtime, the main impetus for the rolling bypass policy, substantially increased during both the Goode and Williams' administrations. Union Officials routinely warned Mayor Williams and Chief Goode of the dangers associated with the continued use of rolling bypass. Despite repeated, emphatic warnings and concerns expressed by Union officials, firefighters, City Council, the public, and the media, Mayor Williams and Chief Goode maintained the rolling bypass policy. Accordingly, Plaintiffs adequately state facts which support conduct that shocks the conscious against Mayor Williams and Chief Goode.

### 3. Maintenance of Policies, Practices, and Customs

Regarding municipal liability under § 1983, "'first inquiry is whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'"[152] "The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security . . . its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means."[153] The Due Process Clause "'is not a 'guarantee against incorrect or ill-advised personnel decisions.'"[154] "Nor does it guarantee municipal employees a workplace that is free of unreasonable risks of harm."[155] Under a § 1983 claim, local governing bodies and

---

[152] *Collins*, 503 U.S. at 123, *quoting City of Canton v. Harris*, 489 U.S. 378, 385 (1989) .

[153] *Collins*, 503 U.S. at 126, *quoting DeShaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189, 196 (1989)..

[154] *Collins*, 503 U.S. at 129, *quoting Bishop v. Wood,* 426 U.S.341, 350 (1976).

[155] *Collins*, 503 U.S. at 129.

officials, acting in their official capacity,[156] may be sued directly for monetary, declaratory, and injunctive relief where, as alleged here, the purported unconstitutional action implements or executes a policy, ordinance, regulation, or decision officially adopted or promulgated by them.[157] A municipality cannot be held liable under § 1983 based solely on *respondeat superior*.[158] "'[I]t is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom.'"[159] "'Once a § 1983 plaintiff identifies a municipal policy or custom, he must demonstrate that, through deliberate conduct, the municipality was the moving force behind the injury alleged.'"[160]

Plaintiffs contend the City is responsible for the continued use of rolling bypass and the under-staffing of the WFD. As alleged by Plaintiffs, City Council repeatedly voiced concerns and questioned the use of the rolling bypass policy since its inception.

To plead a municipal liability claim, "a plaintiff must allege that "'a [local] government's policy or custom inflicted the injury in question.'"[161] A plaintiff does not

---

[156] In the present matter, Major Baker, Mayor Williams, Chief Patrick and Chief Goode are being sued in their individual capacities since they no longer are in office, nor hold any official positions. *See* D.I 1 at 6-7.

[157] *Monell v. Department of Social Services of the City of New York et al.*, 436 U.S. 658, 690 (1978).

[158] *Collins*, 503 U.S. at 123, *referencing Monell*, 436 U.S. at 694-695.

[159] *Chambers ex rel Chambers v. School District of Philadelphia Board of Education,* 587 F.3d 176, 193*, quoting Andrews v. Philadelphia*, 895 F.2d 1469, 1480 (3d. Cir. 1990).

[160] *Chambers ex rel Chambers*, 587 at 193, *quoting Berg v. County of Allegheny*, 219 F.3d 261, 276 (3d Cir. 2000) (internal quotations and citation omitted).

[161] *Estate of Roman v. City of Newark*, 914 F.3d 780, 798 (3d Cir. 2019), *quoting Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

need to identify a responsible decisionmaker in his pleadings,[162] nor is he required to prove that the custom had the municipality's formal approval.[163]

Plaintiffs and the City address the recent case of *Estate of Roman v. City of Newark*. Plaintiffs contend that *Roman* applies because formal approval by the City's governing body is not needed to bind the City, and that a plaintiff need not identify the *Monell* decisionmaker to survive a motion to dismiss.[164] Plaintiffs further argue that factual statements by Union Officials and media coverage support the plausibility their allegations.[165] Defendants counter that *Roman* does not assist Plaintiffs in their allegations of municipal liability based on custom,[166] and that they have not pled direct causation or a Constitutional violation.[167]

*Estate of Roman* noted that to plead a municipal liability claim, "a plaintiff must allege that 'a [local] government's policy or custom . . . inflicted the injury in question.'"[168] It further recognized that "'[p]olicy is made when a *decisionmaker possess[ing] final authority* to establish municipal policy with respect to the action issues an official proclamation, policy or edict.'"[169]

However, the Third Circuit further commented that "[a]lthough a policy or custom

---

[162] *Roman*, 914 F.3d at 798, *quoting Bielevicz v. Dubinon*, 915 F.3d 845, 850 (3d Cir. 1990).
[163] *Roman,* at 798, *citing Anela v. City of Wildwood*, 790 F.2d 1063, 1067 (3d Cir. 1986).
[164] D.I. 52 at 1-2.
[165] *Id*. at 3.
[166] D.I. 54 at 1.
[167] Id. at 4.
[168] *Roman* at 798 *citing Monell v. Dep't of Social Services*, 436 U.S. 658, 694.
[169] *Roman* at 798*, citing Andrews v. City of Philadelphia,* 895 F.2d 1469, 1480 (3d Cir. 1990) (emphasis added.)

is necessary to plead a municipal claim, it is not sufficient to survive a motion to dismiss. A plaintiff must also allege that the policy or custom was the 'proximate cause' of his injuries.'"[170] Proximate cause may be accomplished by "demonstrating an 'affirmative link' between the policy or custom and the particular constitution violation he alleges."[171]

In the instant matter, City Council enacted a statute to address its concerns of under-staffing and overtime.[172] Plaintiffs contend that Mayor Williams and Chief Goode failed to comply with that statute, and were clearly aware of the dangers concerning rolling bypass.[173] They further maintain that the City, through its Mayors and City Council, understood these dangers. Despite this awareness, neither Mayor heeded these concerns. Such inaction supports Plaintiffs' allegations.

Accordingly, the court finds that Plaintiffs allege sufficient facts against the City for maintaining policies, practices or customs.[174]

### D.    Personally Caused the Harm

A defendant in a civil rights action must have personal involvement in the alleged wrongs, which may be shown through factual allegations of personal involvement or

---

[170] *Roman* at 798.
[171] *Id.*
[172] D.I. 46 at 16.
[173] *Id*. at 17.
[174] *See Collins*, 503 U.S. at 122, *noting Pembaur v. Cincinnati*, 475 U.S.469, 483-484 (1986) (where the Court found that the county was responsible for unconstitutional actions by its prosecutor and sheriff because these officials were responsible for "'establishing *final* policy with respect to the subject matter in question.'") (emphasis added)

actual knowledge and acquiescence.[175]  The Third Circuit has held that "a . . . complaint is adequate where it states the conduct, time, place, and persons responsible."[176]  In the instant matter, Plaintiffs allege the time and location as November 16 2016 at 2:56 a.m. at 1927 Lakeview Road in Wilmington, DE.  Plaintiffs identify Mayor Baker, Chief Patrick, Mayor Williams, Chief Goode, and the City as the parties responsible for the institution of and continued use and application of rolling bypass, despite evidence to the contrary of its effectiveness, which caused the injuries that they sustained.

### 1.      Mayor Baker and Chief Patrick

At the time of this incident, Mayor Baker and Chief Patrick had not served in their official capacities for almost three years.  There is no factual support alleged by Plaintiffs that either Mayor Baker or Chief Patrick had any personal involvement in the policies, decisions or practices of the subsequent administration nor the events that occurred in 2016.  Therefore, Plaintiffs factual allegations are insufficient to support personal involvement in relation to Mayor Baker or Chief Patrick..

### 2.      Mayor Williams and Chief Goode

Plaintiffs allege that Mayor Williams and Chief Goode had actual knowledge of both the under-staffing and the rolling bypass policy, and acquiesced to their dangers. Actual knowledge of and acquiescence to the alleged violation must be attributed to the harm caused.  Plaintiffs provide sufficient facts that these defendants knew of the dangers of rolling bypass and the staffing situation of the WFD.  Despite repeated

---

[175] *Evancho v. Fisher*, 423 F.3d 347, 352 (3d Cir. 2005); *see also, Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988).
[176] *Rode*, 845 F. 2d at 1207.

warnings by Union Officials, discussions with and concerns raised by City Council, and questions from the public and the media, rolling bypass and staff shortages occurred during the Williams administration.  Plaintiffs allege adequate facts demonstrating that Mayor Williams and Chief Goode were aware of and acquiesced to the dangers of rolling bypass and insufficient staffing to survive these Defendants' Rule 12(b)(6) motions.

### E.    Qualified Immunity

Qualified or good faith immunity operates as an affirmative defense for the benefit of government officials.[177]  A two-step analysis is involved to determine whether a government official is entitled to qualified immunity.  The court must decide whether the facts alleged by a plaintiff show a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct.[178]  Unless the plaintiff's allegations sufficiently assert a violation, a defendant pleading qualified immunity is entitled to dismissal before discovery.[179] Qualified immunity is a defense to trial, that allows a defendant to avoid the other burdens of litigation.[180]  It is immunity from suit rather than merely a defense to liability.[181]  Absent a factual basis of a clearly established violation, evidence of

---

[177] *Harlow v. Fitzgerald*, 457 U.S. 800, 808 (1982).

[178] *Saucier v. Katz,* 533 U.S. 194, 201 (2001).  *See, Pearson v. Callahan*, 555 U.S. 223, 232, 236 (2009) (where the Court re-evaluated its previous mandated protocol concerning the order of review of the *Saucier* elements finding that judges . . . "should be permitted to exercise their sound discretion in deciding which of the two prongs of qualified immunity should be addressed first in light of the circumstances at hand.")

[179] *Pearson*, 555 U.S. at 236; *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996).

[180] *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

[181] *Id.*

improper motive does not defeat the defense of qualified immunity.[182]

In response to Plaintiffs allegations that Defendants violated the Substantive Due Process Clause of the Fourteenth Amendment, Mayor Baker, Chief Patrick, Mayor Williams, and Chief Goode assert the defense of qualified immunity.[183] Under Third Circuit precedent, neither a municipal government nor its employees are responsible to ensure workplace safety.[184] "[N]either the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause."[185]

However, "when a state official has time to make an unhurried judgement, a Plaintiff need only allege facts supporting an inference that the official acted with a mental state of deliberate indifference."[186]

Defendants Mayor Baker, Chief Patrick, Mayor Williams, and Chief Goode motions were filed under Rule 12(b)(6), the analysis of which is to test the sufficiency of the complaint, and not to resolve disputed facts nor the merits of the case. In its analysis, this court must accept as true all adequately supported material allegations. A plaintiff is only required to allege sufficient facts which state a claim for relief that is plausible on its face. Because the court has found certain allegations sufficient as against Mayor Williams and Chief Goode, at this stage of the proceedings, factual

---

[182] *Grant v. City of Pittsburgh*, 98 F.3d 116, 127, n. 9 (3d Cir.1996).
[183] D.I. 35, 38, 40, 42.
[184] *Kaucher v. County of Bucks,* 456 F.3d 418, 425, *citing Collins v. City of Harker Heights*, 503 U.S. 115, 126-27 (1992).
[185] *Kaucher*, 455 F.3d 418, 424.
[186] *Kedra*, 876 F.3d at 437.

issues remain that affect the application of this defense under Rule 12(b)(6).

### F. Statute of Limitations

Mayor Baker and Chief Patrick assert a statute of limitations' defense. Actions under 42 U.S.C. § 1983 borrow the State statute of limitations for personal injury claims.[187] Pursuant to 10 *Del.C.* § 8119, the limitation period for personal injury claims is two years. An exception to the two year requirement is the continuing violation doctrine.[188] This doctrine provides that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier acts that would otherwise be time barred."[189] The Third Circuit recognizes that "'equitable relief from the statutory limitations period is appropriate only where the alleged violation is occasioned by continual *unlawful* acts, not continual ill effects from an original violation.'"[190]

Here, Plaintiffs allege that the policy of rolling bypass is the proximate cause of the injuries sustained on September 16, 2016, purportedly resulting from Mayor Baker and Chief Patrick's decisions and policies. The latest time frame in which Mayor Baker and Chief Patrick held their respective positions and were involved in the use of rolling bypass ended in January 2013. No facts have been alleged of their continued

---

[187] *Owens v. Okure*, 488 U.S. 235, 245-50. (1989).
[188] *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014), *quoting Brenner v. Local 514, United Bhd. Of Carpenters & Joiners of Am*., 927 F.2d 1283, 1295 (3d Cir.1991).
[189] *Id.*
[190] *Tearpock-Martini,* 756 F.3d at. 236*, quoting Cowell. Palmer Twp.*, 263 F.3d 286, 293 (3d Cir. 2001).

involvement in policies, decisions or practices of the subsequent administration after they left their positions.

Since this action was initiated roughly five years thereafter, the court finds that Plaintiffs assert insufficient facts to establish a violation under the continuing violation doctrine against these Defendants. Because more than two years have expired since Mayor Baker and Chief Patrick held their respective positions and were involved in any decision making, Plaintiffs' claims against them are barred by 10 *Del. C.* § 8119.

## G.   Lack of Standing of Plaintiffs

Mayor Williams, Chief Patrick, and the City assert that Plaintiffs lack standing to bring an action under § 1983. For a plaintiff to have standing, he must have suffered an injury in fact which is concrete and particularized, and is actual or imminent, not conjectural or hypothetical.[191] There must be a causal connection between the injury and the conduct complained of, that is, the injury must be "fairly. . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court."[192] Further, it must be likely, not merely speculative that the injury will be "redressed by a favorable decision."[193] Third Circuit precedence holds that a family member does not have a Fourteenth Amendment substantive due process claim for a death unless the alleged violation was *deliberately directed at the relationship* between the family member and decedent.[194]

---

[191] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).,
[192] *Lujan*, 504 U.S. 560-561, citing *Simon v. Eastern Ky Welfare Rights Organization*, 426 U.S 26, 41-21 (1976).
[193] *Lujan*, 504 U.S. 561.
[194] *Chambers ex rel. Chambers v. School Dist. of Philadelphia Bd. of Education*, 587 F.3d 176, 191 (3d Cir. 2009); *McCurdy v. Dodd*, 352 F.3d 820, 829 (3d Cir. 2003).

While there is no dispute in the present matter that six firefighters suffered injuries or death, family members, who are individually suing in this action and not in the capacity of a representative of an estate, lack standing because the conduct of Defendants was not deliberately directed at any relationship between the decedents and their family members.  Accordingly, this court finds that Plaintiffs Brad Speakman, Terrance Tate, John Cawthray, and the estates of Jerry W. Fickes, Ardythe D. Hope, and Christopher M. Leach have proper standing, to bring an action under § 1983, while the remaining Plaintiffs do not.[195]

### G.    The Political Question Doctrine

Mayor Williams, Chief Goode, and Chief Patrick assert the defense of the political question doctrine.  "The doctrine is an aspect of justiciable, 'which expresses jurisdictional limitations imposed upon federal courts by the case or controversy requirement of Art[icle] III.'"[196]  Thus "it is the relationship between the judiciary and the coordinated branches of the Federal Government, and not the federal judiciary's relationship to the States, which gives rise to the 'political question.'"[197]  An issue is deemed political when its "resolution is committed by the Constitution to a branch of the Federal Government other than this Court."[198]

The United States Supreme Court explained in *Baker v. Carr* that "[p]rominent on the surface of any case held to involve a political question is found a textually

---

[195] *See also* 10 *Del. C.* § 3701.
[196] D.I. 40 at 19, *citing Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 215 (1974).
[197] *Baker v. Carr*, 369 U.S. 186, 210 (1962).
[198] Id.

demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or  the potentiality of embarrassment from multifarious pronouncements by various departments on one question."[199]  These factors are applied to determine whether the question presented is non-justiciable.

"Courts have an obligation in matters before them to view the *complaint as a whole* and to base rulings not upon the presence of mere words but, rather, upon the presence of a factual situation which is or is not justiciable."[200]

According to Plaintiffs, Defendants created dangerous conditions by their policies, practices and customs in violation of their substantive due process rights. Mayor Williams, Chief Goode and Chief Patrick correctly point out that the underlying basis of Plaintiffs' claim is the failure to provide adequate resources to the WFD to enable firefighters to safely perform their jobs.[201]  They contend such allegations relate to legislative and executive decisions, making adjudication impossible without deference to those branches of government who are specifically tasked with creating, reviewing, and approving the City's and the WFD's budget and overseeing its

---

[199] *Baker v. Carr*, 369 U.S. 186, 217 (1962).
[200] *City of Pittsburgh v. WestPenn Power Co.*, 147 F.3d 256, 263 (3d Cir. 1998) (emphasis added).
[201] D.I. 40 at 19.

operations.[202]

Plaintiffs argue that the political question doctrine only applies when the Constitution dictates that resolution of an issue is the responsibility of a "co-equal branch of the <u>federal</u> government"[203], and not applicable to local or State governments.

In his reply brief,[204] Chief Goode maintains that Plaintiffs are incorrect that the political question doctrine only applies to the federal government.  He contends that the allocation of resources within the City and between departments involve non-justiciable political questions, citing *Collins v.City Harbor Lights*.[205]  In *Collins*, the Court found that the administration of government programs involve policy choices to be made by locally elected representatives rather than "by federal judges interpreting the basic charter of Government for the entire country."[206]  This conclusion is followed by the Court's finding that the Due Process Clause is neither "a guarantee against incorrect or ill-advised personnel decisions . . . [n]or does it guarantee municipal employees a workplace that is free of unreasonable risks of harm."[207]

Defendants also contend that the political question doctrine excludes controversies which involve policy choices and value determinations constitutionally committed for resolution to Congress or the executive branch,[208] citing *Sinock v. Gately*,

---

[202] D.I. 38 at 18-19.
[203] D.I. 46 at 94 (emphasis in original).
[204] Neither Mayor Williams nor Chief Patrick in their respective reply briefs addressed Plaintiffs' arguments in their answering brief on the Political Question Doctrine.
[205] D.I. 49 at 10.  *See* 503 U.S. 115, 129-30 (1992).
[206] 503 U.S. at 129.
[207] Id.
[208] *See*, D.I. 38 at 19 D.I. 40 at 19; D.I. 42 at 18.

and *Gilligan v. Morgan,*[209] in support.

*Sincock* was one of a number of decisions by this court which addressed the issue of apportionment (gerrymandering and voting rights) and the validity two state statutes enacted by the state legislature in reaction to this court's initial finding that Section 2, Article II of the Constitution of the State of Delaware and the 1963 Amendments thereto violated the Equal Protection Clause of the Fourteenth Amendment.[210]   Therein, this court noted, in reliance on Supreme Court precedence, that purely political gerrymandering, which was alleged to have occurred in a statutory plan for reapportionment of the Delaware General Assembly, was a political question, an issue not cognizable by the federal court.[211]

*Gilligan* rose from events that occurred on the campus of Kent State University in May 1970.  The case was brought by university students on behalf of themselves and other students, and sought declaratory and injunctive relief for the alleged violations of students' rights during the suppression of civil disorders by the Ohio National Guard.  The then Governor of Ohio called upon the National Guard to preserve civil order and protect public property on the state university campus.[212]  The complaint sought from the District Court injunctive relief from the Governor and "continuing judicial surveillance over the training, weaponry and standing orders of the National Guard."  The District Court dismissed the action holding the claim failed to state a claim upon which relief

---

[209] D.I. 49 at 10.  *Sincock v. Gately*, 262 F. Supp. 739 (D. Del. 1967) and *Gilligan v. Morgan*, 416 U.S. 1 (1973).  Both case were identified in a footnote in Chief Goode's reply.

[210] *Sincock*, 262 F. Supp at 743.

[211] *Id.* at 833.

[212] 416 U.S. at 5.

could be granted.[213]  The Court of Appeals reversed finding the complaint stated a

cause of action, and directed the District Court to resolve whether there was a "pattern

of training, weaponry and orders" that required or made "inevitable the use of fatal force

in suppressing civilian disorders" when nonlethal force "would suffice to restore order."

It also suggested District Court review various articles addressing the prevention and

control of mobs and riots including through the use of troops published by both non-

federal and federal police agencies and others.[214]

    In its analysis, the Supreme Court noted that the plaintiffs were seeking a "broad

call on judicial power to assume present and continuing regulatory jurisdiction over the

activities of the Ohio National Guard."[215]  It criticized the Court of Appeals direction to

the District Court because "[t]his would plainly and explicitly require judicial evaluation of

a wide range of possibly dissimilar procedures and policies approved by different law

enforcement agencies. . . ."[216]  The Court further commented that "[t]rained

professionals, *subject to the day-to-day control of responsible civilian authorities*,

necessarily must make comparative judgements on the merits as to evolving methods

of training, equipping and controlling military forces with respect to their duties under

the Constitution,"[217] and not the judiciary.  The Court found that no justiciable

controversy existed.[218]

    The cases cited herein demonstrate, despite Plaintiffs' argument to the contrary,

---

[213] *Gilligan*, 413 U.S. at 3-4.
[214] *Id.*
[215] *Id.* at 5.
[216] *Id.* at 8. (emphasis added).
[217] *Id.* at 11.
[218] *Id.* at

that the application of the political question doctrine is not just limited to the "co-equal branches of the federal government", but applies to local and State governments.

These cases further demonstrate that this an action, as presently couched, cannot be maintained against Mayor Williams because of the political question doctrine. Regarding whether Chief Patrick and Chief Goode are entitled to similar dismissal of this action, based upon the court's understanding of the limited facts before it in relation to this issue, although they may have been policy makers for the Wilmington Fire Department, neither are elected government officials nor responsible for the other various policies for the City.

## III.    CONCLUSION

1.  For the reasons contained herein, IT IS RECOMMENDED that:

> a.  Defendants James M. Baker and William Patrick Jr.'s Motions to Dismiss (D.I. 34, 41) based on the application of statute of limitations, 10 *Del. C.* § 8116, be GRANTED with prejudice.

> b.  Defendant City of Wilmington's Motion to Dismiss (D.I. 43) be GRANTED in part and DENIED in part.

> c.  Defendant Dennis P. Williams' Motion to Dismiss (D.I. 37) be GRANTED in part and DENIED in part.

> d.  Defendant Anthony S. Goode's Motion to Dismiss (D.I. 39) be GRANTED in part and DENIED in part.

2.  IT IS FURTHER RECOMMENDED that Plaintiffs be GRANTED leave to amend their Amended Complaint within twenty-one (21) days after the issuance of this Report and Recommendation, unless Objections are filed. Should objections be filed, then it is recommended, Plaintiffs be granted twenty-one (21) days after a final decision in this court is issued on the Objections.

3. This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), FED. R. CIV. P. 72(b)(1), and D. Del. LR 72.1. Any objections to this Report and Recommendation shall be filed on or before the dates/time frame note below and consistent with the following page limitations:

a. Because this Report and Recommendation addresses five (5) separate motions to dismiss, any objections filed by Plaintiffs shall be limited to ten (10) pages for each motion, and shall be filed no more than seven (7) days from the date of this Report and Recommendation, that is, on or before **September 4, 2019**. Any response by a Defendant to Plaintiffs' objections addressing that Defendant shall be limited to ten (10) pages, and shall be filed not more than seven (7) days after the filing of Plaintiffs' objections.

Any objection filed by a Defendant shall be limited to ten (10) pages and shall be filed no more that seven (7) days from the date of this Report and Recommendation, that is on or before **September 4, 2019**. Any response by Plaintiffs to a Defendant's objections shall be limited to ten (10) pages after the filing of a Defendant's objections.

The parties are directed to the Court's Standing Order in Non-Pro Se matters for Objections Filed under FED. R. CIV. P. 72, dated October 9, 2013, a copy of which is available on the Court's website, www.ded.uscourts.gov.

Dated: August 28, 2019.                    /s/ Mary Pat Thynge
                                            UNITED STATES MAGISTRATE JUDGE